Filed 1/22/15

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ANGELINA E., a Person Coming Under the Juvenile Court Law. | B253176 (Los Angeles County Super. Ct. No. CK33803) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. T.E., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Valerie Skeba and Emma Castro, Juvenile Court Referees.  Affirmed.

---

&ast; Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of a portion of the Background section as indicated herein and parts II and III of the Discussion.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

Frederick R. Bennett for the Superior Court of Los Angeles County as Amicus Curiae.

_____

T.E. (Mother) appeals from orders terminating reunification services, denying her Welfare and Institutions Code section 388 petition, and terminating her parental rights.[1] We affirm.

## BACKGROUND

**[The following portion of the Background section is deleted from publication.]**

On January 20, 2012, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition under section 300, subdivisions (b) and (j). The petition stated that Mother was incarcerated when she gave birth to Angelina E. in January 2012. The father was unknown, and Angelina was detained and in foster care. Mother was a registered controlled substance abuser, tested positive for methamphetamine on May 4, 2012, and was in prison for burglary at the time of the petition. DCFS alleged that Mother's substance abuse placed Angelina at risk of harm, and as a result of Mother's history of illicit drug use, her two older children (with a different father) were current dependents. The day after Angelina was born, Mother "stated that she believes her cousin[] Latisha will take good care of her daughter." The court detained Angelina after a hearing and gave DCFS discretion to release the baby to any appropriate relative, ordering monitored visits for Mother if she was not under the influence.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

The March 14, 2012 jurisdiction/disposition report stated that Mother was released from prison on February 7, 2012. The day after her release, she denied that she had used drugs, although in 2010 "'some Mexican guys'" put something in her soda and she had been pulled over by the police. She did not have a home. Angelina had been placed with Mother's relative Latisha E. on February 16, 2012. Mother had visited Angelina regularly since her release, and DCFS recommended that monitored visits continue. Given Mother's denial of any drug use and her implication that none of her criminal history was her fault, DCFS recommended that Angelina remain suitably placed and that Mother receive monitored visitation and family reunification services. The juvenile court found that N.C. was Angelina's alleged father.

A supplemental report stated that Angelina had been placed in the home of Latisha E. Mother had tested positive for methamphetamine on April 25, 2012, but continued to deny that she had a drug problem. On the day of the continued hearing, May 14, 2012, Mother filed a waiver of rights and pleaded no contest to the allegations of the petition. At the hearing, the juvenile court, Referee Valerie Skeba presiding, accepted the waiver, sustained the section 300, subdivision (b) allegation of the petition, dismissed the subdivision (j) allegation, and admonished Mother that reunification services could be limited to six months. The court ordered Mother to submit to drug testing every other week or on demand, and attend drug rehabilitation programs, parent education, and individual counseling, with monitored visitation four hours per week. After the father of Mother's two older children (who were no longer dependents of the court) declined to have Angelina placed with him, the court ordered that Angelina remain placed with Latisha E.

An interim review report dated August 13, 2012, stated that Mother had not complied with the drug testing order, with many no-shows and positive results, and continued to deny that she had a drug problem. She had either missed, canceled, or fallen asleep during five of 11 visits with Angelina. A status review report dated November 13, 2012, stated that Mother had not provided proof of any participation in court-ordered services. Her lack of compliance placed Angelina at "*very high*" risk. Mother had the

3

support of Angelina's caregiver, Latisha E., but Mother did not want to deal with her because Latisha E. had been honest with DCFS. Mother had not visited or checked on Angelina's well-being since August 27, 2012.

At a contested hearing on December 3, 2012, Mother testified, as did her individual counselor. The juvenile court found that Mother had not participated in an approved counseling program and found her not credible. Concluding that Mother had not complied with the case plan, the court terminated reunification services and kept the placement order in effect, setting a date for a section 366.26 hearing. Mother was granted monitored visitation for four hours a week. The court notified Mother orally at the hearing and in writing by providing her with the requisite written notice that the termination of reunification services could be reviewed only by writ and of the deadline for filing such a writ.

The section 366.26 report dated May 6, 2013, stated that Angelina remained placed with Latisha E., Mother's first cousin, who had four of her own children residing in the home. Latisha E. was committed to adopting Angelina. Mother's visitation had been infrequent, and her last visit was on August 27, 2012. DCFS recommended that the court terminate Mother's parental rights, find that Angelina was likely to be adopted, and proceed with adoption placement. A subsequent status review report stated that Mother had not complied with the visitation plan, although Latisha E. had consistently brought Angelina to the DCFS office for the visits. After a June 3, 2013 hearing at which Mother appeared, the juvenile court ordered that Mother's visits be confirmed 24 hours in advance.

At a September 3, 2013 hearing, the first before Commissioner and Referee Emma Castro, a DCFS report informed the court that the adoption home study regarding Latisha E. was on hold while DCFS evaluated previous referrals regarding Latisha E.

Mother filed a section 388 petition on December 3, 2013, requesting that the court reinstate family reunification services and evaluate her maternal great aunt, rather than her cousin Latisha E., for placement of Angelina. Mother argued that she had made more progress in her case plan, wanted more services upon her release from custody, and had

4

concerns about Latisha E.  Mother cited a 23-year-old male living in Latisha E.'s home and a physical altercation between Latisha E. and a daughter.  Mother also claimed that Latisha E. interfered with her visits and that Latisha E. did not provide a safe environment for Angelina.

A DCFS report submitted to the court on December 5, 2013, stated that the home study was reviewed and received secondary approval.  Another report informed the court that DCFS opposed reinstating reunification services because Mother had missed most of her visitations, did not comply with court orders when she had reunification services, and Mother "was adamant that the child be placed with the current caregiver until the current caregiver refused to allow [Mother] extended visits in her home, and unmonitored visits without DCFS approval."  Mother's counsel asked for details regarding Latisha E.'s prior referrals.  The juvenile court referred to the December 5 report, which stated that DCFS had to "basically reinvestigate each referral."  The court concluded that "if the home study was approved, that means that the referrals were not deemed to be of concern to the department after being investigated.  So the court will accept that document."   The court denied the section 388 petition because Mother had not demonstrated a change of circumstances and Mother had been reincarcerated on June 22, 2013, with a release date of June 2014.

Mother's counsel then asked for a contested section 366.26 hearing, stating that Mother had been denied visits by Angelina's caregiver.  The juvenile court denied the request.  The court then terminated Mother's parental rights under section 366.26, found the current placement with Latisha E. appropriate, and designated adoption as the permanent plan with Latisha E. as the prospective adoptive parent.

**[The following portion of the Background section is to be published.]**

Referee Valerie Skeba terminated reunification services by order dated December 3, 2012.  Thereafter, Commissioner Emma Castro became the judicial officer presiding.  In her order of December 5, 2013, Commissioner Castro denied Mother's petition under section 388 for an evidentiary hearing and terminated Mother's parental rights pursuant to section 366.26.

5

Mother filed a timely notice of appeal from Commissioner Castro's December 5, 2013 orders.[2] Mother makes no argument regarding those orders, instead arguing only that the order denying her section 388 petition should be reversed because the juvenile court erred in not holding an evidentiary hearing and in failing to order the evaluation of an alternative placement for the minor.

In supplemental briefing, the parties and the superior court addressed Mother's contention that Commissioner Castro was not authorized to act as a referee conducting juvenile court proceedings and therefore her orders denying Mother's section 388 petition and terminating her parental rights were void.

We take judicial notice of a January 4, 2001 order issued by James A. Bascue, the then-presiding judge of the Los Angeles Superior Court, entitled, "ORDER CROSS-ASSIGNING QUALIFIED SUBORDINATE JUDICIAL OFFICERS PURSUANT TO GOVERNMENT CODE SECTION 71622(c)." The order states: "[P]ursuant to Government Code section 71622, subdivision (d) that effective January 4, 2001, and continuing until further order of the Court, all subordinate judicial officers of the Court are cross-assigned without additional compensation to exercise all the powers and perform all the duties authorized by law to be performed by another type of subordinate judicial officer if the person cross-assigned satisfies the minimum qualifications and training requirements for the new assignment established by the Judicial Council pursuant to Government Code section 71622, subdivision (c). [¶] IT IS FURTHER ORDERED that prior to the implementation of this order as to any particular subordinate judicial officer, the Executive Officer/Clerk of the Court shall verify that the position is funded and authorized, and that the person meets the minimum qualifications and training requirements for the new assignment established by the Judicial Council."

Government Code section 71622, subdivision (d), added in 2000, states: "The presiding judge of a superior court may cross-assign one type of subordinate judicial

---

[2] Mother appealed the termination of her parental rights without mentioning the denial of her section 388 petition, but we construe the notice of appeal to encompass that denial. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450.)

6

officer to exercise all the powers and perform all the duties authorized by law to be performed by another type of subordinate judicial officer, but only if the person cross-assigned satisfies the minimum qualifications and training requirements for the new assignment established by the Judicial Council pursuant to subdivision (c)."

We also take judicial notice of an assignment order issued by Presiding Judge of the Juvenile Court Michael Nash, which states in pertinent part: "It is hereby ordered that effective January 1, 2013 . . . the following named Superior Court Commissioners . . . are . . . appointed to sit as referees pursuant to Section 248 et seq. Welfare and Institutions Code, and pursuant to the authority delegated to the Presiding Judge of the Juvenile Court by the Presiding Judge of the Superior Court . . . ." Commissioner Castro's name does not appear on the order.

Section 248 states in pertinent part: "(a) A referee shall hear those cases that are assigned to him or her by the presiding judge of the juvenile court . . . ."

We take judicial notice of an order by Presiding Judge of the Los Angeles Superior Court David S. Wesley. That order provides in pertinent part: "IT IS HEREBY ORDERED that effective May 1, 2013, and subject to further order of the Court, the following named commissioners are assigned to and will preside in Juvenile Courts: [¶] . . . [¶] Commissioner Emma Castro [¶] . . . [¶] IT IS FURTHER ORDERED that the aforementioned commissioners are appointed temporary judges while sitting in Juvenile Courts, or in any other department in which they may preside in the Superior Court."

In supplemental briefing, the Los Angeles Superior Court made the following statement: "Annually, it is Judge Michael Nash's practice as Presiding Judge of the Juvenile Court to appoint commissioners as referees at the beginning of each calendar year, following annual assignments of judicial officers. However, Commissioner Castro was assigned by the Presiding Judge of the Superior Court to the Juvenile Court mid-year on May 1, 2013, and through inadvertence, the Presiding Judge of the Juvenile Court neglected to issue an additional order appointing her as a referee. However, by virtue of the [2001] order of the Presiding Judge of the Superior Court, Commissioner Castro was

7

cross-assigned as a juvenile court referee as of the date of her taking her oath of office on June 2, 2011." (Fn. omitted.)

The Los Angeles Superior Court's brief also represents that "[t]here has been no further order of the court modifying the cross-assignment" made in Presiding Judge Bascue's 2001 order. The superior court argues that, by virtue of the 2001 order, as soon as Commissioner Castro was "assigned . . . to hear juvenile matters, that appointment and assignment included her cross-assignment as a juvenile court referee" and Judge Nash's later orders were "not required or necessary."

Finally, we take judicial notice of an assignment order issued by Judge Nash effective January 1, 2014, which is identical in pertinent part to his January 1, 2013 order and added Commissioner Castro's name, among others.

## DISCUSSION

### I. Commissioner Castro had authority to make the rulings in this case.

Mother contends that only judges, referees, and temporary judges may preside in juvenile dependency proceedings. The parties agree, as do we. (See *In re Courtney H.* (1995) 38 Cal.App.4th 1221, 1225.) Mother also contends that because Commissioner Castro's name was not included on Judge Nash's January 1, 2013 order, her December 2013 orders in Mother's case were void because she was not then a referee or an agreed-upon temporary judge. No party contends Commissioner Castro was acting as a temporary judge. That leaves only one issue: Was Commissioner Castro authorized to hear dependency cases as a referee when she presided over Mother's case? We conclude that she was.

Government Code section 71622, subdivision (a) provides in pertinent part: "Each trial court may establish and may appoint any subordinate judicial officers that are deemed necessary to the performance of subordinate judicial duties, as authorized by law to be performed by subordinate judicial officers." As in effect at the time of the 2001 order, subdivision (b) provided: "The appointment of a subordinate judicial officer shall be made by order entered in the minutes of the court." After amendment in 2003 and as in effect today and at the time of the 2013 order, subdivision (b) provides that the

8

appointment of a subordinate officer "shall be made by order of the presiding judge or another judge or a committee to whom appointment or termination authority is delegated by the court, and shall be entered in the minutes of the court."

Presiding Judge Bascue's 2001 order was authorized by Government Code section 71622. In that order he cross-assigned all commissioners (subordinate judicial officers) to act as referees in juvenile dependency. Nothing in that section requires that judicial officers be named individually in the order. Thus, on the day Commissioner Castro took her oath of office as a commissioner, June 2, 2011, she was cross-assigned as a referee, subject to her being qualified.

No one contends Commissioner Castro was unqualified to perform the functions of a referee and no one has submitted evidence that the superior court failed to assure that she was qualified to act as a referee before placing her in juvenile court. Evidence Code section 664 provides in pertinent part that "[i]t is presumed that official duty has been regularly performed." When a public official is obligated to fulfill a duty before acting, the law presumes that, because the official acted, the duty must have been fulfilled beforehand. (E.g., *Porter v. City of Riverside (*1968) 261 Cal.App.2d 832, 836.) In the absence of evidence that the official duty was not performed, the presumption is conclusive. (*Romero v. County of Santa Clara* (1970) 3 Cal.App.3d 700, 705.) Given the total absence of evidence that the superior court failed to assure that she was qualified, we must presume pursuant to Evidence Code section 664 that the superior court did determine in a timely manner that Commissioner Castro was qualified.

Presiding Judge Bascue's 2001 order expressly states it is effective "continuing until further order of the Court . . . ." No order of Presiding Judge Wesley or any other presiding judge purports to terminate the continuing effect of Presiding Judge Bascue's 2001 order.

Moreover, no order by any presiding judge of the superior court delegates to Judge Nash the authority to cross-assign commissioners to sit as referees. In addition, there is nothing in the record to support the argument that any presiding judge delegated 100 percent of his authority to Judge Nash. Indeed, it is unlikely a presiding judge

legally could have delegated 100 percent of that authority.  (See Cal. Rules of Court, rule 10.603(b)(2) & (d) [limiting a presiding judge's authority to delegate his or her basic duties completely].)[3]

We conclude Commissioner Castro was authorized to make the orders at issue.

## II.  The termination of Mother's reunification services is not reviewable by this appeal.

Mother does not dispute that she received the requisite notice that the termination of her reunification services was reviewable only by writ petition.  (See *In re X.Z.* (2013) 221 Cal.App.4th 1243, 1248–1251.)  Having failed to pursue her proper remedy, Mother cannot obtain relief by means of this appeal.  (*Ibid.*)

Moreover, Mother has not presented to us any argument that termination of reunification services was improper.

## III.  Mother lacks standing to appeal the denial of her section 388 petition.

Mother characterizes her appeal as from the order denying her section 388 petition.  She makes no argument, however, regarding any issue raised in her section 388 petition except her request that the court evaluate her maternal aunt for placement.  Her sole contention is that the court abused its discretion when the court denied her section 388 petition without a hearing regarding placement.

Orders denying section 388 petitions are appealable under section 395, but "[n]ot every party has standing to appeal every appealable order. . . .  [O]nly a person aggrieved

---

[3] The concurrence relies upon a May 3, 2013 order and a November 13, 2013 order.  These orders are irrelevant to our analysis.  Indeed, the November 13, 2013 order was not an order appointing commissioners as referees.  Rather, that order simply designated the commissioners and judges listed as holding "all purpose" assignments so that challenges pursuant to Code of Civil Procedure section 170.6 (which was mentioned specifically in the order) would have to be exercised within a limited period.

The concurrence also questions why Judge Nash's January 2013 and 2014 orders were necessary if Presiding Judge Bascue's 2001 order was adequate.  Such a "belt and suspenders" approach to upholding the law is not unusual.  Moreover, the California Rules of Court encourage superior courts "to publish for general distribution" information "specifying the judicial assignments of the judges . . . ."  (Cal. Rules of Court, rule 10.603(c)(1)(C).)

by a decision may appeal. [Citations.] An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).) To determine whether Mother was aggrieved and therefore has standing to appeal, we must "precisely identify" Mother's interest. (*Ibid.*)

In *K.C.*, *supra*, 52 Cal.4th 231, the father of a dependent child appealed the denial of a section 388 petition filed by the child's grandparents, requesting that his placement be modified to place the child in their home. The father argued that he believed the child should be placed with the grandparents, but he did not offer any argument against terminating his parental rights. The trial court denied the section 388 petition and, without further argument from the father, terminated his parental rights. The father then appealed from both the denial of the section 388 petition and the judgment terminating his parental rights, limiting his argument to the child's placement and arguing that if the Court of Appeal reversed the placement order, it should also reverse the judgment terminating parental rights. The Court of Appeal dismissed the appeal because the father was not aggrieved by the placement decision, as it could not be shown to affect his parental rights. (*K.C.* at p. 235.)

The Supreme Court noted that the father's reunification services had been terminated and "the decision to terminate or bypass reunification services ordinarily constitutes a sufficient basis for terminating parental rights." (*K.C.*, *supra*, 52 Cal.4th at pp. 236–237.) The father did not argue that any exception applied and "does not contend the order terminating his parental rights was improper in any respect. That he has no remaining, legally cognizable interest in K.C.'s affairs, including his placement, logically follows." (*Id.* at p. 237.) This was not a case in which "parents whose rights had been terminated were aggrieved by, and thus *did* have standing to appeal, pretermination orders concerning their children's placement, because the possibility existed that reversing those orders might lead the juvenile court not to terminate parental rights. These cases do not assist father because he makes no such argument." (*Ibid.*) "From

these decisions we derive the following rule: A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights. This rule does not support father's claim of standing to appeal because he did not contest the termination of his parental rights in the juvenile court. By thus acquiescing in the termination of his rights, he relinquished the only interest in K.C. that could render him aggrieved by the juvenile court's order declining to place the child with grandparents." (*Id.* at p. 238.) The Court of Appeal properly dismissed the father's appeal for lack of standing because the "father has not shown that he is aggrieved by the juvenile court's order denying grandparents' motion concerning placement." (*Id.* at p. 239.)

As in *K.C.*, *supra*, 52 Cal.4th 231, Mother's parental rights were terminated at a hearing following the denial of a section 388 petition related to placement. Mother limits her argument on appeal to Angelina's placement, without any discussion of her other contentions in her section 388 petition. Unlike the father in *K.C.*, she makes no argument on appeal that if we reverse the denial of her section 388 petition, we should also reverse the judgment terminating parental rights. As in *K.C.*, Mother's failure to contend that the termination of her parental rights was improper in any respect leaves her with no remaining legally cognizable interest in Angelina's placement.

We recognize that at the December 5, 2013 hearing, Mother stated in support of her request for a contested section 366.26 hearing that she had been denied visitation by Latisha E. Even construing that as an argument in the trial court against terminating her parental rights, she has now abandoned any contention that the order terminating her parental rights was improper by failing to raise that issue on this appeal, wherein she does not contend that there is any possibility that reversing the denial of the section 388 petition would affect the order terminating her parental rights.

Mother does not have standing to appeal the trial court's order denying her section 388 petition regarding placement.

12

**DISPOSITION**

The juvenile court's December 5, 2013 orders are affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


MILLER, J.*

I concur:


ROTHSCHILD, P. J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13

JOHNSON, J., Concurring.

I agree with the majority's conclusion that Commissioner Emma Castro was authorized to hear cases as a referee when she issued the minute order on December 2013, but I disagree with the majority's analysis. The 2001 order cross-assigns each subordinate judicial officer (such as a commissioner) to exercise the powers and perform the duties of any other type of subordinate judicial officer (such as a referee), with the proviso that such cross-assignment is subject to the subordinate judicial officer being qualified and trained for the cross-assignment. The majority, however, glosses over any requirement of subsequent action by the court to verify that an individual commissioner is qualified to be cross-assigned, despite the court's practice of issuing annual orders appointing named commissioners as referees. Further, the majority curiously discards as "irrelevant" the order assigning Commissioner Castro to preside in juvenile court and appointing her a temporary judge (of which we took judicial notice at the superior court's request), and the order assigning cases to her for all purposes including trial. This reasoning effectively dispenses with the 2001 order's requirement that a commissioner meet minimum qualification and training requirements before he or she may be appointed a referee. But the 2001 order and the statute it implements both explicitly require more, and, to quote Shakespeare, "there's the rub." (Hamlet, act 3 scene 1.)

The timing of Commissioner Castro's appointment as a referee arose when counsel for T.E., in supplemental briefing, asked us to take judicial notice of a January 14, 2013 order by Michael Nash, then the presiding judge of the juvenile court, entitled "ASSIGNMENT ORDER" and stating that commissioners previously assigned to sit as temporary judges "are also appointed to sit as referees," effective January 1, 2013. (We took judicial notice of that order and of a number of other orders, as the majority describes.) Commissioner Castro was not among the names on the accompanying list of referees, as she was not assigned to juvenile court until May 1, 2013, as evidenced by a May 3, 2013 order by David S. Wesley, the presiding judge of the Los Angeles Superior Court, entitled "ASSIGNMENT OF COURT

COMMISSIONER FOR THE YEAR 2013," and assigning commissioners, including Commissioner Castro, to preside in juvenile court as temporary judges effective May 1, 2013. Commissioner Castro was named as a referee in Presiding Judge Nash's January 2, 2014 "ASSIGNMENT ORDER" (of which we took judicial notice on our own motion) using the same language as the January 2013 assignment order, and appointing Commissioner Castro as a referee effective January 1, 2014—after she made the orders in this case in December 2013. The Department of Family and Child Services declined to stipulate expressly or impliedly to any commissioner hearing the proceedings in the capacity of a temporary judge. "A court commissioner is a 'different and separate statutory creature' from a juvenile court referee." "'The Juvenile Court Law makes no provision for the use of *commissioners* in juvenile court.' (*In re Mark L.* (1983) 34 Cal.3d 171, 176, fn. 4 . . . .)" (*In re Courtney H.* (1995) 38 Cal.App.4th 1221, 1224, 1226.) If Commissioner Castro was not a referee, she had no authority to make the orders.

The majority relies entirely on the 2001 order by James Bascue, then the presiding judge of the superior court, which states that until further order all subordinate judicial officers are cross-assigned to perform all the duties of any other type of subordinate judicial officer, but only "if the person cross-assigned satisfies the minimum qualifications and training requirements for the new assignment established by the Judicial Council pursuant to Government Code section 71622, subdivision (c)." The 2001 order also requires that "prior to the implementation of this order as to any particular subordinate judicial officer," the executive officer or clerk of the court shall verify "that the person meets the minimum qualifications and training requirements for the new assignment established by the Judicial Council." This language echoes the referenced statute, Government Code section 71622, subdivision (d), which states: "The presiding judge of a superior court may cross-assign one type of subordinate judicial officer to exercise all the powers and perform all the duties authorized by law to be performed by another type of subordinate judicial officer, but *only if the person cross-*

2

*assigned satisfies the minimum qualifications and training requirements for the new assignment . . . .*" (Italics added.) Both the statute and the 2001 order require that before cross-assignment, a subordinate judicial officer meet minimum qualification and training requirements, and both mandate verification by the court that those requirements are met. I conclude that the January 2013 and January 2014 assignment orders, which state that they are "pursuant to the authority delegated to the Presiding Judge of the Juvenile Court by the Presiding Judge of the Superior Court," implement the 2001 order and satisfy Government Code section 76122, subdivision (d)'s requirement that the court verify that the named commissioners, who were previously assigned as temporary judges in juvenile court, have satisfied the qualification and training requirements to sit as referees. Had Commissioner Castro been specifically named as a referee in an order like these annual orders before she presided over T.E.'s case, there would be no issue regarding her authority.

The majority acknowledges that a 2003 amendment to Government Code section 71622, subdivision (b) specifically allows the superior court to delegate the authority to appoint a subordinate judicial officer, but the majority ignores the specific language in the January 2013 and January 2014 annual orders acknowledging that such delegation took place, thus casting doubt on whether the presiding judge of the juvenile court had the authority to issue the annual orders appointing commissioners as referees. Notably, the superior court does not make that argument, and it is not supported by the record. It is not material whether the delegation of authority was absolute. I trust the language of the orders to demonstrate that the delegation was sufficient to make the January 2013 and January 2014 annual orders effective appointments of commissioners as juvenile court referees. Both of those orders by Judge Nash state that the commissioners appointed as referees had previously been assigned by order of the presiding judge of the superior court to sit in juvenile assignments as temporary judges, and we also took judicial notice of those previous orders. The January 2013 and January 2014 annual orders demonstrate that there is a difference between assigning a commissioner to juvenile court as a

3

temporary judge and appointing a commissioner as a referee, and that those two events do not follow automatically or occur simultaneously. They also demonstrate that the court did not consider that the 2001 order alone was sufficient to appoint every commissioner as a referee. As I explained above, this is consistent with the statute's requirement and the order's language requiring verification of further training and qualifications.

The majority dispenses with any requirement of a record that the court has verified that a commissioner be qualified as required by Government Code section 76122, subdivision (d) before he or she is cross-assigned as a referee by asserting that no one claims that Commissioner Castro was unqualified at the time she issued the orders. But T.E.'s claim is that Commissioner Castro lacked a specific appointment as a referee—a fact that the parties do not dispute. It is not T.E.'s or any other party's burden to ask whether the court has verified that a commissioner is qualified to sit as a referee: the 2001 order requires that the executive officer or clerk of the court shall verify that the commissioner meets the minimum qualifications and training requirements. The annual orders appointing commissioners as referees provide the public with the assurance that the court has verified that juvenile court referees have the training and the qualifications necessary to make orders in dependency court that as commissioners they had no authority to make.

The superior court's brief is silent regarding the verification that Commissioner Castro met the requirements. It states, however, both that it is the presiding judge of the juvenile court's practice to appoint commissioners as referees at the beginning of each year, and that it was "through inadvertence" that Commissioner Castro was not so appointed when she was assigned to juvenile court on May 1, 2013. Further, the brief states that the cross-assignment as a referee took place when she was assigned to hear juvenile matters. I accept that statement as a representation that Commissioner Castro met the minimum qualification and training requirements to be a referee when she was assigned to the Juvenile Court pursuant to the May 2013 order. A subsequent order in

4

November 2013 by Presiding Judge of the Juvenile Court Michael Nash (of which we took judicial notice at the request of the Department of Children and Family Services), entitled "'ALL PURPOSE' ASSIGNMENTS IN THE DEPENDENCY COURTS," assigned cases "to the judicial officers regularly presiding in such departments for all purposes including trial" and included Commissioner Castro, effective June 4, 2013. The November 2013 order assigning cases to her for all purposes further evidences that at the time of the December 2013 orders in this case, Commissioner Castro was fully qualified to be appointed as a referee. The 2001 order cross-assigned Commissioner Castro as a referee, subject to a requirement that her training and qualifications be verified. The May 2013 and November 2013 orders (which the majority describes as irrelevant) constitute that verification, especially in light of the superior court's representation that the absence of a specific order appointing Commissioner Castro as a referee when she was assigned to juvenile court in May 2013 was a court oversight. Importantly, I do not conclude that the May 2013 and November 2013 orders appointed Commissioner Castro as a referee. I simply believe that those orders evidence a verification by the respective issuing presiding judges that Commissioner Castro had fulfilled her training and qualification requirements.

Clarity and certainty, as well as the interests of the public and the litigants (and the conservation of appellate judicial resources) would have been far better served had the court followed its practice of issuing a timely and specific appointment order naming Commissioner Castro as a referee. The general rule is that "absent a specific appointment as a referee, she is a commissioner or a temporary judge, depending on whether she meets the statutory requirement of obtaining stipulation of the parties litigant." (*In re Courtney H.*, *supra*, 38 Cal.App.4th at p. 1225.) In *Courtney H.*, however, the court reached this conclusion because there was no specific appointment order naming the commissioner as a referee, and there was "no ambiguity on the face [of the order] and . . . no reflection of any intent to the contrary." (*Id.* at p. 1226.) In this case, the 2001 order reflects the superior court's intent that a commissioner be cross-

5

assigned as a referee when he or she meets the minimum training and qualification requirements, and the subsequent orders serve to verify that Commissioner Castro met those requirements. The majority's diminishment of the requirement that a commissioner be qualified and trained before cross-assignment as a referee (and that the court verify the qualifications and training) is unnecessary to the disposition of this particular case and is in conflict with the order, the statute, and the record in this case.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.

6